Statement.

# Wytheville.

PLUNKETT v. SUPREME CONCLAVE, IMPROVED ORDER OF HEP-
TASOPHS.

June 14, 1906.

1. BENEFIT SOCIETIES—*Certificate of Membership—Subsequent By-Laws—
Suicide.*—A person who applies for and receives a certificate of
membership in a benefit society, by which the applicant promises
and agrees to be bound by the laws of the society then in force and
those to be thereafter adopted by the society, is bound by a subse-
quent law, duly passed, which provides for a forfeiture of said cer-
tificate, or a lessening of the value thereof, in case the member
shall, while sane, commit suicide, although no such law existed
when the certificate was issued.

2. BENEFIT SOCIETIES—*Action for Benefit—Plea of Suicide—Admissions
by Demurrer to Plea.*—Upon a demurrer to a plea alleging that,
in the benefit certificate sued on and also in the application
therefor, the assured promised to conform in all respects to
the laws, rules and usages of the defendant which issued the
certificate, in force at the time of said application and certificate,
and those to be thereafter adopted, and that the defendant did sub-
sequently and while the certificate was in force adopt a law declar-
ing that no benefit should be paid to the beneficiary of any member
committing suicide (sane or insane); and further averring that
the member to whom the certificate in suit was issued committed
suicide, and died from the effects of a pistol wound inflicted by
himself with suicidal intent, the demurrer admits that the law was
regularly and duly enacted, that the member committed suicide,
and that he was sane when he did it.

Error to a judgment of the Circuit Court of the city of Rich-
mond, in an action at law on an insurance policy.  Judgment
for the defendant.  Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Alex. R. Sands* and *C. R. Sands,* for the plaintiff in error.

*Olin Bryan, Wm. Flegenheimer* and *Henry Flegenheimer,* for the defendant in error.

KEITH, P., delivered the opinion of the court.

"It appears from the record that Charles W. Plunkett applied for membership in the Improved Order Heptasophs on June 28, 1897, and in his application he agreed 'to conform in all respects to the laws, rules and usages of the order now in force, or which may hereafter be adopted by the same.' Upon said application he was admitted as a member, and on the 12th day of August, 1897, a benefit certificate for the sum of two thousand ($2,000) dollars was issued to him, his wife, Estelle V. Plunkett, beneficiary. This certificate was delivered and accepted 'upon the condition that the said brother herein complies with the laws, rules and regulations now governing said conclave and benefit fund, or that may, in the future, be enacted by the Supreme Conclave to govern said conclave and fund.' At the time Plunkett applied for membership, and at the time the benefit certificate was delivered to him, there was no by-law of the company in regard to the suicide.

"At the session of the Supreme Conclave, held in June, 1903, section 257 of constitution and by-laws was enacted. This section provided as follows: 'No benefit shall be paid to the beneficiary or beneficiaries of any member committing suicide (sane or insane); provided, however, that where such suicide has completed one year of membership (although the Supreme Conclave shall by his act be released from all claims represented by the benefit certificate) his beneficiary or beneficiaries shall, nevertheless, receive from the Supreme Conclave a sum of

money in full discharge of all demands which he, she, or they might otherwise have had upon said Supreme Conclave, equal to the equitable proportion of the total benefit, such equity to be determined by the number of years the suicide was a member of the order as related to his expectancy of life when admitted.' This by-law was in force on the 9th day of August, 1903, upon which day Charles W. Plunkett committed suicide and died from the effects of a pistol-shot wound inflicted by himself with suicidal intent.

"The beneficiary, upon proper proofs of death, made a demand for the face value of the benefit certificate, to-wit, the sum of two thousand dollars. The demand was refused, and thereupon she brought her action.

"The defendants tendered two special pleas. The first alleged that in the application and also in the benefit certificate that Charles W. Plunkett promised to conform in all respects to the laws, etc., in force at the time of said application and benefit certificate, and those thereafter to be adopted; that section 257 had been thereafter adopted; and that the said Plunkett committed suicide and died from the effects of a pistol wound inflicted by himself with suicidal intent. The second plea set forth the above facts, and in addition thereto, that in accordance with section 257 the defendant was indebted to the plaintiff in the sum of $333.34, and that on the day when the said sum became due the defendant tendered the plaintiff said sum; that the plaintiff wholly refused to accept; and that the defendant has ever been and still is ready to pay the said plaintiff the said sum, which the defendant brought and paid into court. To both of these pleas the plaintiff demurred.

"It was contended, in support of said demurrer, that the by-laws interfered with rights which had become fixed and vested by the terms of the original contract. The demurrer

admits that its enactment was regular and in accordance with the provisions of the defendant's constitution, and by the express terms of the contract between the plaintiff's husband and the defendant the former agreed to comply 'with all the laws, rules and regulations now governing said conclave and benefit fund, or that in the future may be enacted by the Supreme Conclave to govern the said conclave and fund.' Therefore, the by-laws regularly adopted by the defendant became retrospective as well as prospective in their operation, except as to the rights which had become fixed and vested by the terms of the original contract. In the original contract there was no mention of death by self-destruction or suicide of a member, whether sane or insane. The demurrers to the pleas also admit that the plaintiff's husband was a suicide; and the meaning of the word suicide is, as defined by the Century Dictionary, 'one who commits suicide; at common law, one who, being of years of discretion and sound mind, destroys himself, and the act itself is defined by designedly destroying one's life.' 'To constitute suicide at common law the person must be of years of discretion and of sound mind'; but in addition to this definition there is a presumption of sanity which must be entertained in the absence of proof. Insanity cannot be predicated simply upon the act of self-destruction, for human experience has shown that sane men have taken their own lives. To the extent that the by-law provided for the forfeiture of contract rights in the event of suicide by the insured while sane, it is valid first, because it invades no vested rights of the insured; and second, because it is a fundamental though unexpressed part of the original contract that the insured should not intentionally cause his own death. Inasmuch as the original contract and by-laws were silent upon the subject of suicide by the insured while sane, the new by-law is valid, because there can be no

such thing as a vested right for a sane man to commit suicide, and for the further reason that it is nothing more than the written expression of the provision which the law had read into the contract at its inception.

"Therefore, inasmuch as the demurrer admits that the plaintiff's husband was sane at the time of the commission of the suicide, the court is of the opinion that there can be no recovery except in accordance with the terms of the by-laws of the association."

Thus far we have adopted the opinion of the judge of the Circuit Court, and shall content ourselves with adding a few authorities in support of his conclusion.

In *Bain* v. *Societe St. Jean Baptiste,* 172 Mass. 319, 52 N. E. 502, 70 Am. St. Rep. 287, the Supreme Judicial Court of Massachusetts held that where "a by-law of a beneficiary association, providing that every member should have a right to five dollars a week if he became disabled during a period not exceeding thirteen weeks in each year, was amended so as to provide that 'when a member has received thirty-nine weeks of sick benefits he shall not hereafter receive more than one dollar per week, instead of five dollars, for thirteen weeks of each year,' during a period of five years, the amended by-law applied to a member who, at the time of its adoption, was under a disability, and had received payment of benefits for thirty-nine weeks."

In *Tisch* v. *The Protected Home Circle,* 72 Ohio St. 233, 74 N. E. 188, it is said that "A by-law adopted by a fraternal benefit association, which provides that a benefit certificate issued to a member shall be void and all benefits thereunder forfeited in case the insured shall die by suicide, felonious or otherwise, sane or insane, although adopted after the benefit certificate was issued, and before the death of the insured by suicide, violates no vested right of the beneficiary."

In *Daughtry* v. *Knights of Pythias,* 48 La. Ann. 1203, 20·
South. 712, 55 Am. St. Rep. 310, it was decided that under a.
contract of life insurance issued by a mutual company, condi-
tioned to be subject to any by-law thereafter to be enacted, the
insured is bound by a subsequent by-law forfeiting such poli-
cies when the insured should die by his own hands; citing and
approving *Supreme Commandery Knights of Golden Rule* v.
*Ainsworth,* 71 Ala. 436, 46 Am. Rep. 332.

In *Shipman* v. *Protected Home Circle,* 174 N. Y. 398, 67
N. E. 83, the court says: "Where the contract is silent upon the
subject of the suicide of a member while sane, a by-law subse-
quently enacted, providing that the certificate issued to him
shall become void in case he shall die by suicide, felonious or
otherwise, sane or insane, or by his own hand, sane or insane,
provided that in such case there shall be refunded to the benefi-
ciary named in said certificate the amount of all payments made,
together with interest thereon at the rate of three *per cent. per
annum,* applies to a certificate, in force at the time of the
amendment, issued to a member who thereafter commits suicide
while he is sane—first, because it invades no vested right; and
second, it is a fundamental though unexpressed part of the
original contract that the insured shall not cause his own
death." See also *United Moderns* v. *Colligan* (Tex. Cir.
App.), 77 S. W. Rep. 1032.

The case presented to us upon the pleadings is that of a
sane man who takes his own life. In other words, as was said
in *Burt* v. *Union Cent. L. Ins. Co.,* 187 U. S. 181, 47 L. Ed.
216, 23 Sup. Ct. 139, do insurance policies insure against
crime? Is that a risk which enters into and becomes a part of
the contract?

In *Amicable Soc.* v. *Bolland,* 4 Bligh N. R. 194, decided by
the House of Lords, the Lord Chancellor said: "It appears to

me that this resolves itself into a very plain and simple consideration.  Suppose that in the policy itself this risk had been insured against; that is, that the party insuring had agreed to pay a sum of money year by year upon condition that in the event of his committing a capital felony, and being tried, convicted, and executed for that felony, his assignees shall receive a certain sum of money—is it possible that such a contract could be sustained?  Is it not void upon the plainest principles of public policy?

"Would not such a contract (if available) take away one of those restraints operating on the minds of men against the commission of crimes—namely, the interest we have in the welfare and prosperity of our connections?  Now, if a policy of that description, with such a form of condition inserted in it in express terms, cannot, on grounds of public policy, be sustained, how is it to be contended that in a policy expressed in such terms as the present, and after the events which have happened, that we can sustain such a claim?"

In *Burt* v. *Union Cent. L. Ins. Co., supra,* it is held, upon grounds of public policy, that a policy of life insurance does not insure against the legal execution of the insured for crime, even though he may in fact have been innocent, and therefore unjustly convicted and executed.

And in *Ritter* v. *Mutual L. Ins. Co.,* 169 U. S. 139, 42 L. Ed. 693, 18 Sup. Ct. 300, Mr. Justice Harlan, delivering the opinion, said:  "There is another consideration supporting the contention that death intentionally caused by the act of the assured when in sound mind—the policy being silent as to suicide—is not to be deemed to have been within the contemplation of the parties; that is, that a different view would attribute to them a purpose to make a contract that could not be enforced without injury to the public.  A contract, the tendency

---

---

of which is to endanger the public interests, or injuriously affect the public good, or which is subversive of sound morality, ought never to receive the sanction of a court of justice, or be made the foundation of its judgment. If, therefore, a policy—taken out by the person whose life is insured, and in which the sum named is made payable to himself, his executors, administrators, or assigns—expressly provided for the payment of the sum stipulated when or if the assured, in sound mind, took his own life, the contract, even if not prohibited by statute, would be held to be against public policy, in that it tempted or encouraged the assured to commit suicide in order to make provision for those dependent upon him, or to whom he was indebted. Is the case any different in principle if such policy is silent as to suicide, and the event insured against—the death of the assured—is brought about by his wilful, deliberate act when in sound mind ?"

We have not found it necessary to express any opinion as to whether or not the by-law in question in this case would be binding upon members who afterwards became insane, and while insane committed suicide, and as to such persons no opinion is expressed.

We think the authorities cited fully vindicate the opinion and judgment of the Circuit Court, and it is affirmed.

*Affirmed.*