## CIRCUIT COURT OF LOUDOUN COUNTY

Roger Lee Elgin, III,
Executor

v.

Anil J. Patel et al.

June 25, 1996

Case No. (Law) 16101

BY JUDGE THOMAS D. HORNE

This case comes before the court on post trial motions filed by defendants Arthur S. Rosecan, M.D., Arthur S. Rosecan, M.D., P.C., Anil J. Patel, M.D., and Anil J. Patel, M.D., P.C. They contend that the verdict rendered against them by the jury in this case should be set aside, or in the alternative, that the court order a remittitur of the damages fixed by the jury. For the reasons stated herein, the court will deny these motions and enter judgment against such defendants in accordance with the jury verdict.

Because the jury returned verdicts for the plaintiff and against the defendants, Rosecan and Patel, Inc., the Court will, in evaluating the motions, view the evidence in a light most favorable to the plaintiff. The verdict should not be set aside unless it is plainly wrong or without evidence to support it. *Lane v. Scott*, 220 Va. 578 (1979).

On the morning of August 10, 1993, Jean Norman Elgin jumped to her death from a second story window of the Sunrise Retirement Home located in Leesburg, Virginia. Before and at the time of her death, Mrs. Elgin had been under the care of Dr. Rosecan, a psychiatrist, and Dr. Patel, an internist. Testimony in the case revealed that for a number of years, Mrs. Elgin had suffered from a bipolar disorder, mania, and depression. Her medical history revealed prior suicide attempts, periods of hospitalization, and the use of drug therapy in the treatment of her illnesses.

Following her release from a period of hospitalization at the Medical College of Virginia, she was placed on Tegretol, an anti-seizure medication. This drug has proven useful in the treatment of seizure disorders such as those a patient might experience following brain surgery. While at the Medical College of Virginia, Mrs. Elgin had undergone surgery for a brain tumor. In addition, Tegretol has proven useful as a mood stabilizer in the treatment of bipolar disorders. Upon discharge from the hospital, Mrs. Elgin's physicians continued her on Tegretol not only because of the risk of seizure, but also to treat her bipolar disorder.

Expert testimony presented by the plaintiff traced responsibility for the death of Mrs. Elgin to the medical malpractice of the defendant doctors. Such experts found to a reasonable degree of medical probability that, but for the breaches of the appropriate standard of care by her treating physicians in removing her from the Tegretol, she would not have committed suicide.

Although Sunrise Retirement Home was a defendant in this action, the jury returned a verdict in its favor. Accordingly, the Court need not discuss further the nature of the action against Sunrise, believing such issue of liability to have been finally determined by the jury.

Defendants contend that plaintiff is barred from recovery as a result of his failure to prove the decedent was of unsound mind at the time she committed suicide. They rely upon the principle that a party who consents to or participates in an illegal or immoral act, such as suicide, cannot recover damages from other participants in the act and that in the absence of proof that the plaintiffs' decedent was of unsound mind at the time of the suicide, there can be no recovery. *Miller v. Bennett*, 190 Va. 162 (1949); *Zysk v. Zysk*, 239 Va. 32 (1990); *Wackwitz v. Roy*, 244 Va. 60 (1992); see generally, *Annotation*, Civil Liability for Death by Suicide, 11 A.L.R.2d 751. However, each of the cases relied upon are inapposite to the instant claim.

The Court must determine whether the plaintiff has pleaded and proven sufficient facts to remove this case from the bar of the general rule of *volenti non fit injuria*. A review of the cases relied upon by the defendants is helpful to an understanding of the Court's decision in the instant case.

In *Miller*, the Court denied recovery to one who participated in an illegal abortion. The plaintiff's unsuccessful claim in *Zysk* was based upon having been involved in illegal sexual activity. *Wackwitz*, a case upon which the defendants principally rely, is factually distinguishable from the instant case. Although the Supreme Court in *Wackwitz* addressed the issue

of *volenti non fit injuria* within the context of the pleadings, it is instructive that the facts pleaded would suggest that the negligence of the physician and the wrongful act of the patient concurred in bringing about the death of the plaintiff's decedent. Thus, the plaintiff was found to have pleaded, and would have the burden of proving, that the deceased was of unsound mind at the time of the suicide.

In the instant case, Mrs. Elgin had been completely removed from the Tegretol days prior to her death. It is this removal of Mrs. Elgin from this medication which resulted in injury. Once removed from the drug, she could no longer control the self-destructive behavior that accompanied her mental illness. Were she to have survived, any intentional or negligent conduct on her part might, if proven, have been considered in mitigation of damages, but not as a bar to recovery. In order to bar recovery, the negligence of the physician and the wrongful conduct of the patient must concur in bringing about the injury and damage to the plaintiff. See, *Lawrence v. Wirth*, 226 Va. 408, 412 (1983); *Eiss v. Lillis*, 233 Va. 545 (1987).

The jury was entitled to rely upon the opinions of plaintiff's experts. It was their conclusion that, so long as Mrs. Elgin was continued on Tegretol, her underlying mental illness was controlled to the extent she would not have taken her life. Conversely, absent Tegretol, there was a reasonable medical probability that she would commit suicide. Once removed from the drug, Mrs. Elgin did not have the ability to control her medication and thus mitigate any adverse affects brought about by her removal from the drug. Plaintiff's evidence would suggest that nothing she could have done after she was weaned of the Tegretol could have reversed the process set in motion by the defendants' negligence. Such a conclusion would obtain whether she was of sound or unsound mind at the time she took her life. Her death by suicide was a reasonably foreseeable consequence of the negligent care of her physicians.

Counsel for the defendants assert that the Court erred in limiting the cross-examination of plaintiff's experts as to their knowledge in fact of the standard of care of physicians practicing in their specialty in the Commonwealth. At issue are the relevant provisions of § 8.01-581.20 of the Code of Virginia. That statute provides, in pertinent part, that:

> In any . . . action against a physician . . . to recover damages alleged to have been caused by medical malpractice where the acts or omissions so complained of are alleged to have occurred in this Commonwealth, the standard of care by which the acts or omissions are to be judged shall be that degree of skill and

diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth and *the testimony of an expert witness, otherwise qualified, as to such standard of care, shall be admitted . . . . Any physician who is licensed to practice in Virginia shall be presumed to know the statewide standard of care in the specialty or field of medicine in which he is qualified and certified. This presumption shall also apply to any physician who is licensed in some other state of the United States and meets the educational and examination requirements for licensure in Virginia. An expert witness who is familiar with the statewide standard of care shall. not have his testimony excluded on the ground that he does not practice in this Commonwealth. A witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.* [Emphasis added.]

Counsel for the defendants would suggest that the Court has interpreted the provisions of the statute to create a non-rebuttable or conclusive presumption that those physicians licensed by other states, who meet the educational licensure requirements in the Commonwealth, may testify as to the appropriate standard of care. This is not correct.

Counsel for the defendants sought to cross-examine the expert witnesses, licensed in another state and yet meeting the licensure requirements of the Commonwealth, as to their knowledge in fact as to the appropriate standard of care in the Commonwealth. They did not seek to explore their familiarity with the standard of care in the state of their licensure, nor did defendants seek to demonstrate any differences which might exist between the standard of care in the Commonwealth and the standard of care governing the practice of physicians in their states of licensure.

To permit a challenge to the competency of an expert based upon their lack of familiarity with the standard of care in the Commonwealth would render the provisions of the statute relative to licensure in other states meaningless, as foreign physicians, familiar with the appropriate standard

of care in the Commonwealth are, by the mandate of the same statute, competent to express such opinions.

The Court believes that the presumption of competency afforded by the statute is a rebuttable presumption and that foreign physicians meeting the licensing requirements of the Commonwealth may testify subject to the party challenging the competency of the expert to question their knowledge of the standard of care in the specialty in which they are licensed or by a showing that, despite being qualified for licensure, the standard of care in the state of their licensure is different from that in the Commonwealth.

This Court cannot conclude that the jury verdict was excessive or otherwise improper. Although counsel for the defendants makes much of the desire of one of the jurors to express to the Court her feelings relative to the testimony she had heard, the Court sees this situation differently. At the beginning of the trial, the Court impressed upon the jury the serious nature of their undertaking. A review of the record will reveal an extensive and searching *voir dire*. The juror, rather than keeping her feelings to herself, expressed them to the Court and counsel. She was not allowed to remain on the jury until after the Court had conducted a thorough examination to determine whether she could put aside any emotions of the moment and judge this case impartially. There is nothing in the record or in the observations of the Court which would have indicated that the juror in question could not hear this case objectively, impartially, and without sympathy and passion.

Although there was emotional evidence in the case, the Court can point to nothing which would indicate that such evidence caused the jury to decide this case on sympathy or passion. Lastly, the Court cannot conclude that the jury verdicts were excessive in this case. *Rutherford v. Zearfoss*, 221 Va. 685 (1980).